# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
### AT WINCHESTER

| | | |
|---|---|---|
| **RODNEY HILL and KATIE HILL** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **No. 4:19-cv-00078** |
| **AUTO-OWNERS (MUTUAL)** | ) | |
| **INSURANCE COMPANY,** | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| **Defendant.** | ) | **Collier/Steger** |

## AMENDED COMPLAINT

Plaintiffs, Rodney Hill and Katie Hill, by and through counsel, and for their claims against Defendant Auto-Owners (Mutual) Insurance Company, seeking an award of compensatory damages and such other relief to which they may be entitled, state as follows:

## INTRODUCTION

1.      A little over an hour past midnight on November 6, 2018, the Hills' home alarm blared.  Rodney Hill leapt from his bed and ran to his living room where he saw strong winds surging outside.  He and his wife, Katie Hill, had been watching the weather the previous day and knew that a stormfront would be coming through the Decherd, Tennessee, area, but they did not expect what they confronted early that morning on November 6.  In the darkness, a flash in the storm-torn sky showed Rodney what was happening.  There, outside his home, a tree had been uprooted, flipped sideways and was being held parallel to the ground by the winds of a tornado.

2.      Rodney called Katie to get their two children, Fischer and Hunter, as he ran to their bedroom to help her. Windows near the boys' beds shattered.  Katie grabbed Fischer.

1

Rodney grabbed Hunter and together, as windows continued to break and their home shook with a force that felt like a freight train was barreling down upon them, they ran for the safety of the crawlspace of their home. But when Rodney flung open the door to their attached garage, a large tree crashed through its door and a 2x4 shot through the garage into Katie's vehicle. Rodney and Katie changed plans. They would have to hunker down as far away from the windows as possible in the sturdiest place accessible to them—the family fireplace in their den. From there, the Hills weathered the rest of the storm praying they would be safe when it was all over.

3. What the Hills experienced was a category-EF2 tornado that damaged, destroyed and/or caused significant damage or total loss to their property, including many of the contents, personal property, and valuables located therein (the "Loss"). The Hills promptly reported the Loss to their insurance provider, Auto-Owners (Mutual) Insurance Company ("Auto-Owners") on November 6. They fully complied with the procedures, requirements, and terms of their insurance policy with Auto-Owners and paid all required premiums. Yet, to date and despite their contractual obligation, Auto-Owners has refused to fully cover the Hills' loss pursuant to the parties' contract, and the Hills' home remains significantly damaged, preventing them from returning home. Because of Auto-Owners' refusal to honor its contractual obligations and promptly cover the complete cost of the Hills' Loss, the Hills bring this suit for breach of contract and for bad faith refusal to pay loss pursuant to Tenn. Code Ann. § 56-7-105.

## THE PARTIES

4. Plaintiffs Rodney and Katie Hill (hereinafter "the Hills" or "Mr. and/or Mrs. Hill") are adult citizens and residents of Franklin County, Tennessee. At all times relevant hereto, Plaintiffs owned the real property and improvements located at 243 Allred Road, Decherd, Tennessee, 37324 (hereinafter, the "Insured Premises"), where they resided.

5.     Defendant Auto-Owners is an insurance company headquartered at 6101 Anacapri Boulevard, Lansing, Michigan, 48917, conducting and transacting business in Tennessee.  Auto-Owners has a mailing address in Tennessee at P.O. Box 517, Brentwood, Tennessee, 37024. Auto-Owners is part of the Auto-Owners Insurance Group, a national provider of insurance products represented by over 47,000 licensed agents in 26 states and offering multiples lines of insurance including life, home, auto and business.  At all relevant times, Auto-Owners conducted and transacted insurance business with Plaintiffs in Franklin County, Tennessee, and continues to conduct and transact business in Franklin County, Tennessee.

6.     This Complaint arises from a November 6, 2018, EF2 tornado that significantly and permanently damaged and/or destroyed and caused significant or total loss to the Insured Premises and many of the contents and valuables located therein.  The Hills fully complied with the procedures, requirements, and terms of the Policy in submitting their claim for coverage to Auto-Owners.  Yet, to date, Auto-Owners has refused to cover the Hills' loss pursuant to the Parties' contract, giving rise to this suit for breach of contract and for bad faith refusal to pay loss pursuant to Tenn. Code Ann. § 56-7-105.

## SUBJECT MATTER JURISDICTION

7.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332 because there is complete diversity of citizenship between the opposing Parties and the amount in controversy (excluding interest and costs) exceeds $75,000.

## PERSONAL JURISDICTION

8.     The Court has personal jurisdiction over Defendant under Federal Rule of Civil Procedure 4(k)(1), and Tenn. Code Ann. §§ 20-2-214, 20-2-223, and 20-2-225.  The exercise of

personal jurisdiction over Defendant accords with both the Constitution of the United States and the Constitution of Tennessee.

## VENUE

9.      Venue lies in this judicial district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred within this District.  Venue also lies in this District under 28 U.S.C. § 1391(b)(3) because Defendant is subject to the Court's personal jurisdiction.

## FACTUAL ALLEGATIONS

### *The Hills' Homeowner's Insurance Policy with Auto-Owners*

10.      On or about June 25, 2018, Auto-Owners issued a homeowner's insurance policy to the Hills bearing Policy No. 51-215661-01 (the "Policy, "the "Homeowner's Policy," or the "Contract") pursuant to the terms of which Auto-Owners agreed to insure the Insured Premises and its contents against loss or damage, as well as provide additional coverages.  The term of the Policy was June 25, 2018 to June 25, 2019.  A copy of the Policy is attached as Exhibit A.

11.      At all times relevant hereto and at the time of the Loss, the Hills were insureds of Auto-Owners in full compliance with the procedures, requirements, and terms of the Policy.

12.      The Insured Premises consists of two structures, the Hills' home (the "Dwelling") and detached garage, as well as the contents and valuables located therein.  The Insured Premises is depicted in the aerial image attached hereto as Exhibit B.

13.      The Policy provides insurance coverage for accidental, direct physical loss to the Hills' dwelling, other structures, and personal property, among other things, located on the Insured Premises, except as specifically excluded or limited by the Policy.  *See* Exhibit A.  At the time of the Loss, the Homeowner's Policy limit for insurance coverage, in relevant part, was

$259,500 for the Hills' Dwelling, $25,950 for Other Structures, $225,790 for Personal Property, and $51,900 for Additional Living Expense and Loss of Rents. *See* Exhibit A.

14.     The Policy also includes a Guaranteed Home Replacement Cost endorsement which provides that "[i]f, prior to a covered loss to [the Hills' dwelling, the Hills have] paid an additional premium for any increase in the limit of insurance, then at the time of a covered loss to [their] dwelling, if [the Hills] repair or replace [their] dwelling: the Coverage A – Dwelling limit of insurance stated in the [Homeowner's Policy's] Declarations shall, if necessary, be increased to equal the current replacement cost of [the Hills'] dwelling and shall apply to the cost of repairing or replacing [their] dwelling at the residence premises . . . ." *See* Exhibit A at Guaranteed Home Replacement Cost Addendum.

15.     The Policy provides that "if the Coverage A – Dwelling limit of insurance stated in the Declarations is increased, then the limit of insurance stated in the Declarations for: Coverage B – Other Structures; Coverage C – Personal Property; and Coverage D – Additional Living Expense and Loss of Rents shall be increased by the same percentage that the Coverage A – Dwelling limit of insurance has been increased . . . ." *See* Exhibit A at Guaranteed Home Replacement Cost Addendum.

16.     In addition, the Policy also includes an endorsement for an additional $50,000 limit of coverage for Coverage B – Other Structures and provides, in relevant part, that "[t]he limit of insurance stated for each [structure covered by Coverage B – Other Structures] shall apply in addition to the specific amount of insurance afforded to that structure under Coverage B – Other Structures." *See* Exhibit A at Other Structures – Additional Limit.

17.     Pursuant to the Policy, the Hills were required to pay a premium to Auto-Owners in exchange for the insurance coverage. The Hills' insurance premium included an additional

premium as a part of their insurance coverage to secure the benefits of the Guaranteed Home Replacement Cost provision and the Other Structures – Additional Limit.  *See* Exhibit A.  All required premiums were paid at the time of the Loss.

### *The November 6, 2018, Tornado and the Loss*

18.     On November 6, 2018, between 1:16 AM and 1:26 AM, a category EF-2 tornado touched down near Tims Ford Lake in northwestern Franklin County, intensifying as it tracked nearly 16 miles and reached peak velocities of up to 130 miles per hour ("mph").  The Hills' residence was located directly in the path of the tornado.  The tornado damaged, destroyed and/or caused significant damage or total loss to the Insured Premises, including many of the contents, personal property, and valuables located therein.

### *Repairs Necessary to Restore the Hills' Home to Its Pre-Tornado Condition*

19.     The damage to the Hills' residence was extensive.  As detailed in David Cartwright's structural engineering report and Roy Lawson's appraisal, attached hereto as Exhibits C and D, respectively, significant, and in many cases, total repairs are necessary to restore the Hills' residence to its pre-tornado condition.  For example, the roofing materials on both the Hills' home and detached garage were significantly damaged by the tornado's 130 mph winds and will need to be totally replaced.  The roof framing and sheathing of both structures must be repaired at all damaged locations, and all gutters and downspouts must be replaced and properly connected to foundation drains.  The wall framing of both structures must be replaced at buckled and bowed locations; the porch roof support framing on the Hills' home must be replaced; and the floor system of the Hills' home will require extensive repairs.  There is extensive damage to the doors, sheetrock and electrical systems of both structures.  Furthermore, all driveway concrete slabs must be repaired and replaced; all damaged soffit/eave coverings

must be replaced; and the damaged brick veneer must be completely repaired or replaced, among other issues.

20.     In addition to structural repairs, extensive asbestos abatement at the Hills' residence will be necessary, and numerous windows that are broken or cracked will need to be replaced.

### *Auto-Owners Breaches the Insurance Agreement in Bad Faith*

21.     The Hills promptly reported the Loss to Auto-Owners on November 6, 2018, and their troubles with Auto-Owners began almost immediately.  The morning of November 6, the Hills contacted their insurance agents at Lester, Greene & McCord ("LGM"), speaking to Mr. Joe Lester, who assured the Hills their insurance provider would take care of them.

22.     Later that day, a claims adjuster for Auto-Owners, Dani McClelland, called the Hills to discuss the Loss.  She informed the Hills that she would not be able to come to their home because of the conditions, specifically because the Hills' roof was wet.  On that same call, she also inquired whether Mr. Hill was sure the damage all around him had been caused by a tornado.  McClelland then informed the Hills that a claims adjuster would not come to the Insured Premises on November 6, but instead, would be there the next day.

23.      On November 7, McClelland finally made it to the Hills' home to perform an assessment.  With Mrs. Hill and Wayne Wright, the Hills' contractor, showing McClelland the damage Mr. Wright had observed, McClelland, Mrs. Hill, William Goodman (Mrs. Hill's father) and Mr. Wright walked the Insured Premises.  Critically, McClelland refused to inspect the Dwelling's roof on November 7.  That same day, she emailed the Hills to let them know that she had arranged for a structural engineer, Matthew Buckner, to assess the structures on the Insured Premises.

24.    On November 8, Auto-Owners issued its First Adjustment check in the amount of $35,723.76 based on the assessment performed by McClelland.  On November 14, the Hills received their first adjustment.  The next day, on November 15, when the Hills discussed moving from their home in light of the damage, McClelland stated that the Hills were getting ahead of themselves.  Instead, she suggested that the Hills remain in their home while repairs were done, and that they move from room to room when each one needed work.  When Mrs. Hill told Ms. McClelland that one of the Hills' children has severe allergies and that he could not stay in a home with holes in the roof and potentially exposed asbestos, McClelland responded that moving the Hills would be difficult, despite the allowance in their Policy with Auto-Owners for such a purpose.

25.    On November 16, Auto-Owners' hired structural engineer, Buckner, performed Auto-Owners' first structural assessment with Wayne Wright, Mrs. Hill, Mr. Goodman and Chris Vaughn present.   During his assessment, Buckner evaluated the Hills' home and detached garage but critically failed to do a complete and comprehensive asbestos assessment, scraping only from the Hills' popcorn ceilings but failing to analyze the ceiling tape/mud joints, among other things.  On information and belief, Buckner did not take photos sufficient to document the damage (or lack thereof) he observed in his inspection of the attic, did not take photos sufficient to document the damage (or lack thereof) he observed in his inspection of the Hills' crawlspace, and failed to accurately count the number of broken windows in the Hills' home and detached garage, among other deficiencies.  Buckner stated that his report would be complete and ready by Wednesday, November 21.

26.    Throughout the rest of November 2018, the Hills were unable to reach anyone at Auto-Owners regarding the status of their claim or anyone who could help the claims process

8

proceed.  On November 20, 21 and 26, the Hills repeatedly checked on the status of the structural engineer's report but received no reply or contact from McClelland or anyone else at Auto-Owners.  On November 27, when the Hills called LGM, one of their representatives, Cassie Cresson, stated that McClelland was at training.  The next day, November 28, the Hills spoke with Joe Lester, who stated he would have someone get back to the Hills.  Finally, on November 30, a representative of LGM called Mrs. Hill and stated that LGM was waiting to hear from Auto-Owners' claims manager.

27.     On December 3, the Hills learned that a new adjuster had been assigned to their case, and on December 4, they learned that their new adjuster from Auto-Owners was to be Matthew Rogers.

28.     On December 4, Rogers informed the Hills that he and Auto-Owner's structural engineer, Buckner, would be at the Hills' home later that afternoon.  Later that day, with Chris Vaughn, Wayne Wright, Mr. Hill and Mrs. Hill all present, Rogers and Buckner conducted Auto-Owners' second structural engineer assessment, almost one month after the Hills' home was destroyed by the tornado.

29.     The Hills received Buckner's report on December 14.  On December 17, they received Auto-Owner's Second Adjustment and proposed payment of $65,702.38.

30.     On December 19, in an email from the Hills to Matthew Rogers, the Hills disputed Auto-Owner's December 17 adjustment and disagreed with Buckner's structural report related to the damage to their home and detached garage.  They notified Auto-Owners that they had hired an independent structural engineer, and that they had been advised not to begin any repair or replacements to their home and garage until the claims process had been settled.  The Hills further stated that they were unable to comply with the 60-day deadline for submitting their

9

sworn proof of loss because of the delay Auto-Owners caused in getting them the December 14 structural engineer's report, but they stated, however, that they would forward their structural engineer's report along to Auto-Owners as soon as they received it. A true and correct copy of this email is attached as Exhibit E.

31. On December 20, Rogers responded by requesting the names of the Hills' experts and counsel so they could contact them to discuss the matter and see where the Parties disagreed. Rogers also agreed to extend the Hills' deadline to submit their sworn statement in proof of loss and supporting documentation to February 6. Rogers further inquired as to whether the Hills had hired attorneys to represent them. A true and correct copy of this email is attached as Exhibit F.

32. On December 20, alarmed by the tone of Rogers' response, Mrs. Hill stated that although they were not currently represented by counsel, the Hills were not ruling out hiring an attorney to enforce their rights under the Parties' contract. Mrs. Hill noted that she and her husband pay their premiums on time, would continue to do so, and that "[w]e expect your performance with your policy coverage in a similar manner." A true and correct copy of this email is attached as Exhibit G.

33. On January 17, 2019, the Hills delivered their proof of loss, David Cartwright's engineer's report, and Wayne Wright's estimate to Joe Lester of LGM. On January 22, Auto-Owners confirmed they had received the Hills' proof of loss and other documentation.

34. From January 22 to February 21, the Hills received no response from Auto-Owners concerning their proof of loss. In an email to Rogers dated February 21, 2019, the Hills made a demand for payment and resolution of their claims. That email, in its entirety, stated as follows:

Mr. Rogers,

We are curious as to the status of the above claim that occurred back on November 6, 2018. The last communication we received from any representative of Auto Owners Insurance concerning our home was an acknowledgement of the receipt of our loss information and that it would be reviewed in a timely response. This information was provided in response to yours and your engineer assessment of damages to our home. As you are aware, the assessment of damages we had performed is substantially different from the insurance company assessment in virtually all aspects of the damage done to our home by a direct hit from a F2 tornado. The differences are too many to list here, but can easily be seen by close examination of our home as we had done by qualified experts and comparing all expert damage reports.

Our assessment was delivered to our Auto Owners Agent back on January 17, 2019. Does it really take this long to review your loss information or better yet, our loss information? We have yet to receive a phone call, a visit by anyone associated with Auto Owners, or any claims person concerned with our case, our damaged home, or our family living temporarily in a rental property while this "review" has been going on for the past thirty plus days. We are not sure as to what kind of review is going on, if this is standard operating claims procedure for Auto Owners or the insurance industry as a whole, but we are the ones paying the price for these delays and we are paying.

According to your policy language, the next step is the appraiser/umpire stage and according to the recent past history of our claims procedure, this needs to begin. Our house is just sitting there getting worse while this "timely response" is taking place. The lack of any communication on our case has been indescribable. **We need to hear from someone exhibiting some type of effort towards [an] amicable solution to this claim or we will be forced to skip all the steps in the claims process except the last one.**

Rodney and Katie Hill

35.    A true and correct copy of the Hills' February 21, 2019, email in which they made a formal demand is attached as Exhibit H (emphasis supplied).

36.    On February 22, 2019, the Hills further contacted Auto-Owners and sent them an additional sworn statement in proof of loss, requesting in light of Auto-Owners egregious delays and their formal demand of February 21 that Auto-Owners respond to the sworn statement in proof of loss within 15 days from February 22.

37. Given the Hills' demand, Auto-Owners requested the Hills participate in the appraisal process required by the Policy. The appraisal process set forth in the Policy (hereinafter, "the Appraisal Process") states:

> If you and we fail to agree on the actual cash value or amount of loss covered by this policy, either party may make written demand for an appraisal. Each party will select a competent and impartial appraiser and notify the other of the appraiser's identity within 20 days after the demand is received. The appraisers will select a competent and impartial umpire. If the appraisers are unable to agree upon an umpire within 15 days, you or we can ask a judge of a court of record in the state where the residence premises is located to select an umpire.

> The appraisers shall then appraise the loss, stating separately the actual cash value and loss to each item. If the appraisers submit a written report of an agreement to us, the amount agreed upon shall be the actual cash value or amount of loss. If they cannot agree, they will submit their differences to the umpire. A written award by two will determine the actual cash value or amount of loss.

> Each party will pay the appraiser it chooses, and equally pay the umpire and all other expenses of the appraisal.

> We retain our right to deny the claim in the event there is an appraisal.

*See* Exhibit A at 14.

38. As the quoted provision confirms, the Appraisal Process was not binding, and was never intended to resolve any type of dispute regarding the scope of the covered loss or the scope of coverage under the Policy. Specifically, while the Appraisal Process provides an avenue for resolving disputes regarding the "actual cash value and loss *as to each item*," it does not provide a mechanism for resolving disputes about which *items* are at issue, *i.e.*, what items and/or losses are covered under the Policy. Indeed, the provision expressly preserves Auto-Owners' ability "to deny the claim in the event there is an appraisal." In other words, even after the Appraisal Process has been completed, Auto-Owners can *still deny the claim*. Thus, the plain language of the provision confirms that any disputes regarding coverage or the scope thereof cannot be addressed through the Appraisal Process. Moreover, any suggestion that the "written award by

two" would be somehow binding upon the insured ignores the fact that in this Policy, Auto-Owners specifically preserved its ability to dispute or even deny coverage, notwithstanding the completion of the Appraisal Process.

39.     At the request of Auto-Owners and because it was required under the Policy, the Hills went through the Appraisal Process.  Despite Auto-Owners' request to proceed to the Appraisal Process, the first appraisal inspection did not take place until June 10, 2019.

### The Appraisal Process and Auto-Owners' Refusal to Cover Damage Caused by the Tornado

40.     The Hills had very little faith in Auto-Owners fulfilling its contractual obligation to cover their Loss (a prediction that was more than accurate) because prior to (and during) the Appraisal Process, Auto-Owners refused to acknowledge and cover certain damage the Hills identified as being caused by the November 6, 2018, tornado.  As Mrs. Hill stated in her February 21, 2019, email, "the assessment of damages we had performed is substantially different from the insurance company assessment in virtually all aspects of the damage done to our home by a direct hit from a F2 tornado.  The differences are too many to list here, but can easily be seen by close examination of our home as we had done by qualified experts and comparing all expert damage reports."

41.     The Parties' correspondence, as well as the materials prepared by the Parties' experts, confirm that at the time the Parties began the Appraisal Process, their disagreements extended well beyond a dispute over the cost of repairs – the Parties disagreed about the scope of the loss attributable to the tornado and, as a result, the scope of the coverage provided under the Policy.  Specifically, the Hills made it abundantly clear to Auto-Owners that they disagreed with virtually every aspect of Auto-Owners' assessment of the damage to the Hills' home that was attributable to the tornado.  Auto-Owners expressly refused to consider or value, for coverage

purposes, damage that its appraisers claimed was not caused by the storm. Those assertions were directly challenged by the Hills' independent structural engineer. As a result of that dispute, going into the Appraisal Process, Auto-Owners was attempting to value the cost of repairing an entirely different set of problems than the Hills had demanded that Auto-Owners cover under the Policy. And, as further discussed, *infra*, the Parties continued to disagree about those issues throughout the Appraisal Process. Critically, and consistent with the language in the Policy addressing the Appraisal Process, the Hills *never* agreed that the appraisers would have the authority to resolve any of the Parties' disputes regarding the scope of the covered damage or the scope of coverage under the Policy.

42. The Appraisal Process began on June 10, when Mike Gates (Auto-Owners' appraiser) and Roy Lawson (the Hills' appraiser) conducted a joint appraisal of the property. Following the June 10 joint inspection, Gates and Mr. Lawson submitted their first estimates of the Replacement Cost Value ("RCV") to Masters. Gates submitted an RCV estimate of $99,512.57. Mr. Lawson submitted an RCV estimate of $294,029.36.

43. Subsequently, a second joint inspection was undertaken on July 30, 2019, with Gates, Mr. Lawson, Matthew Buckner (Auto-Owners' engineer), Wayne Wright (the Hills' contractor), and Larry Masters all present.

44. The Parties' disagreements during the Appraisal Process were wide-ranging and much more than a simple disagreement over the cost of a particular set of repairs. Just as they had since the date of Auto-Owners' initial inspection, the Parties disagreed about the scope of the damage that was attributable to the storm and the scope of the coverage under the Policy. In other words, and to quote the language of the Appraisal Provision, the appraisers were never in agreement regarding which "items" were to be valued. For example, Gates determined that

damage to the Dwelling's brick was not caused by the tornado but instead was caused by poor workmanship.  Mr. Lawson disagreed, stating that wind uplift, impact loads, pressure, and flying debris cause this type of damage to brick, not mere non-uniform widths of mortar joints.  In addition, Gates argued that the damage to the detached garage's brick was not caused by the tornado, but instead was the result the detached garage settling.  Mr. Lawson countered, stating that the cracks in the brick wall of the detached garage were not from settlement and that there was enough wind and tree debris damage present to require replacement of the entire brick veneer.  Gates and Mr. Lawson also disagreed on whether the tornado caused other significant items of damages, such as the structural damage to the Hills' roof and its rafters, as well as wind damage to the Dwelling's floor system.  Finally, Gates also failed (and/or intentionally refused) to identify significant wind and tree damage to the detached garage that represents collateral damage to the home.

45.    In short, the appraisers for both sides were operating on entirely different sets of assumptions regarding (1) the scope of the damage caused by the tornado and (2) the scope of coverage under the Policy.  As a result, the appraisals prepared by Gates, Masters, and Mr. Lawson reflected not appraisals of the costs of various types of repairs, but also causation and coverage decisions.

46.    Based on their respective causation and coverage determinations, following the joint appraisal inspection, both Auto-Owners' appraiser and the Hills' appraiser submitted estimates.  Following the July 30 inspection, Gates submitted a final RCV estimate of $93,762.07, and Mr. Lawson submitted a final estimate of $325,024.89.  The disparity in these figures demonstrates the significant differences in the damage each appraiser identified and what damage they stated was caused by the tornado.

47.     On September 3, 2019, umpire Larry Masters issued a proposed award of $128,408.89 via email.  Masters' award acknowledges the significant differences between the damage identified by Gates and Mr. Lawson to have been caused by the tornado,

> We have reports from two state registered engineers.  Because they are not in accord on several issues, a decision had to be made between the differences.  I suggested we bring in a[] third engineer to assist with that but only with a unanimous decision by the panel to do so.  Roy was not in favor of it for expense reasons.  I certainly understand and respect that.  So[,] any decisions between any conflicting engineering opinions and the appraiser's work products would have to be made by the umpire.

48.     A true and copy of this email is attached as Exhibit I.

49.     Masters' award demonstrates that he made causation and coverage decisions.  Specifically, Masters stated, "[t]he floor framing was not damaged *by the storm*;" and "the concaved courses of brick on the front elevation (the area to the left of the front porch) was originally laid that way [or in other words, not caused by the tornado]."  *See* Exhibit I (emphasis supplied).

50.     On September 27, 2019, based on the umpire's proposed award, Auto-Owners sent a letter to Mr. and Mrs. Hill along with a check for $48,938.65.  According to Auto-Owners, this letter and enclosed payment represents the extent of their obligation to the Hills. The causation and coverage decisions made by appraisal umpire, Larry Masters, were outside the scope of the appraisal process and Masters' authority as appraisal umpire.  Nonetheless, these causation, coverage and liability determinations resulted in his proposed award to the Hills. Because Masters purported to determine the cause of the Loss during the appraisal process, the award is not binding on the Hills' or Auto-Owners.  *See Merrimack Mut. Fire Ins. Co. v. Batts*, 59 S.W.3d 142, 152 –53 (Tenn. Ct. App. 2001) (determining that appraisers do not have the prerogative to determine whether any particular loss claimed by an Insured is caused by a

tornado or whether the insurance company is ultimately liable under its policy for the loss, and holding: "The final responsibility for resolving disputes over those issues, assuming the parties cannot reach an agreement on their own, rests with the courts.") (emphasis supplied).

51.     The Hills' claim for damage to their home and detached garage was for the full replacement cost of their damaged property or approximately three hundred twenty-five thousand twenty-four dollars and eighty-nine cents ($325,024.89). To date, Auto-Owners has issued checks to the Hills (which have not been cashed or deposited) of One Hundred and Eleven Thousand Three Hundred and Eighty-Seven Dollars and Fifty-Nine Cents ($111,387.59).

52.     In addition to the foregoing claimed amounts under the Policy, the Hills have suffered extensive damage resulting from Auto-Owners' delay in covering the Loss and fulfilling its contractual duties, totaling approximately $40,899.97. These damages include out-of-pocket expenses incurred by the Hills because of Auto-Owners' breaches, as well as expenses resulting from compliance with the Policy without reciprocal performance by Auto-Owners of its contractual obligations.

53.     Despite the clear and extensive proof of damage to the Hills' home; the detailed proofs of Loss; the extensive, thorough and complete examinations and reports by the Hills' engineer and appraiser; and the Hills' patience and numerous exchanges of communications concerning coverage for their home and detached garage, Auto-Owners has refused to perform under the Policy it drafted and has refused to cover the full extent of the damage to the Hills' home caused by the tornado on November 6, 2018. Auto-Owners has breached its contractual obligations, and the Hills bring this suit for breach of contract and for bad faith refusal to pay loss pursuant to Tenn. Code Ann. § 56-7-105.

## Count I – Breach of Contract

54.     The allegations contained in Paragraphs 1 through 53 are incorporated by reference.

55.     The Policy is a contract between the Hills and Auto-Owners and is supported by valid consideration.  The Policy provided insurance coverage for loss or damage to the Insured Premises and its contents.  At the time of the Loss, the Policy's stated limits of insurance coverage, in relevant part, were $259,500 for the Hills' Dwelling, $25,950 for Other Structures, $225,790 for Personal Property, and $51,900 for Additional Living Expense and Loss of Rents, and also included a Guaranteed Home Replacement Cost endorsement which, in relevant part, provides that "the Coverage A – Dwelling limit of insurance stated in the [Homeowner's Policy's] Declarations shall, if necessary, be increased to equal the current replacement cost of [the Hills'] dwelling and shall apply to the cost of repairing or replacing [their] dwelling at the residence premises . . . ."  *See* Exhibit A.  In addition, the Policy also included an endorsement for an additional $50,000 limit of coverage for Coverage B – Other Structures and provided, in relevant part, that "[t]he limit of insurance stated for each [structure covered by Coverage B – Other Structures] shall apply in addition to the specific amount of insurance afforded to that structure under Coverage B – Other Structures."  *See* Exhibit A at Other Structures – Additional Limit.

56.     The Policy provides insurance coverage for all accidental, direct physical loss or damage to the Insured Premises unless the loss is specifically excluded in the Policy.  As it relates to the Loss suffered by the Hills, there is no applicable exclusion.

57.     As a result of the Loss, the Hills made a claim on the Policy with Auto-Owners.  Auto-Owners admitted the loss was compensable and issued checks to the Hills purporting to

cover the Loss. Auto-Owners has not fully paid the Hills for their Dwelling and Other Structures claims, even though such claims are within the stated limits of the Policy and are further covered by the Guaranteed Home Replacement Cost and the $50,000 Additional Limit for Coverage B endorsements of the Policy.

58.     Auto-Owners is in total, material breach of the Policy, and Auto-Owners is liable to the Hills under the Policy as a result of the Loss and their failure to fulfill their contractual obligations.

59.     Auto-Owners' breach of contract includes, without limitation, its failure and refusal to pay all of the Hills' losses that were covered under the terms of the Policy and/or should have been covered under the terms of the Policy, specifically including the entirety of the replacement cost of the Hills' home under Coverage A – Dwelling and their detached garage under Coverage B – Other Structures that were damaged in the Loss, among other losses covered under the terms of the Policy.

60.     Despite the admission by Auto-Owners that the Loss is compensable under the Policy, as evidenced by Auto-Owners' repeated yet insufficient proposed payments to the Hills, and the fact the Hills have fulfilled all duties imposed upon them under the terms of the Policy with Auto-Owners, as well as the Hills being at no fault in this matter, Auto-Owners has breached the Policy by refusing to timely and fully pay the Hills' claim for insurance proceeds. Auto-Owners has not only refused to pay the entirety of the Hills' claims but has also refused and failed to pay the portion of the claim that falls within the stated limits of the Policy, the Guaranteed Home Replacement Cost, and the $50,000 Additional Limit for Coverage B endorsements, for which the Hills paid an additional, special premium to secure such coverage and protection.

61.     As a result of Auto-Owners' breach of contract, the Hills have sustained substantial compensable losses for the amounts claimed under the Policy, as well as money damages for economic losses and other numerous and assorted incidental and consequential damages to be proven at trial. Auto-Owners is liable to the Hills for their damages.

62.     Auto-Owners' breach of contract relative to its failure to pay the Hills the insurance benefits to which they are entitled was, and is, intentional, fraudulent, and/or reckless, therefore justifying an award of punitive damages. Specifically, Auto-Owners intentionally, fraudulently, and/or recklessly: (1) failed to effectuate a prompt and fair settlement of the Hills' claims when liability was clear; (2) refused and failed to conduct a reasonable investigation concerning the Loss and the Hills' contractual right to benefits under the Policy; (3) unjustly refused and/or failed to pay the Hills' claim for its own financial preservation with no reasonable or justifiable basis; (4) failed to treat the Hills' interests with equal regard to its own; (5) promised prompt action and claim-handling but then failed to provide any payment; (6) engaged in unreasonable delay in the claims handling process; (7) utilized the services of biased third-parties for the purpose of obtaining support for the denial of the full satisfaction of the Hills' claims under the Policy; (8) intentionally ignored the reports and information provided by unbiased and neutral experts regarding the cause and nature of the Loss for the purpose of reducing their payment amounts for the Hills' claim; and (9) unjustly refused to pay the Hills' claim for benefits under the Policy. Auto-Owners knew, or reasonably should have known, that the Hills were justifiably relying on the money and benefits due them under the terms of the Policy. Nevertheless, acting with conscious disregard for Plaintiffs' rights and with the intention of causing (or willfully disregarding the probability of causing) unjust and cruel hardship on the Hills, Auto-Owners ignored the Hills' valid claim and then denied the full amount of the Hills'

claim and withheld monies and benefits rightfully due the Hills. The Hills also incorporate by reference herein those allegations set forth below. The Hills seek, and are entitled to, punitive damages.

## Count II – Statutory Bad Faith

63.     The allegations contained in Paragraphs 1 through 62 of this Complaint are incorporated by reference herein.

64.     Auto-Owners' failure to pay the amounts contractually owed to the Hills is arbitrary and capricious and constitutes bad faith pursuant to Tenn. Code Ann. § 56-7-105 in that more than sixty (60) days have passed since a formal demand has been made on Auto-Owners and full payment has not been made for the Loss as required pursuant to the Policy, for which the twenty-five percent (25%) statutory penalty for bad faith should be invoked.

65.     The bad faith of Auto-Owners is evidenced by (a) the fact that, at all times hereto, Auto-Owners knew, or reasonably should have known, that the Hills were justifiably relying on the money and benefits due them under the terms of the Policy and as otherwise promised and represented by Auto-Owners, as well as (b) the actions of Auto-Owners set forth above and below. Nevertheless, acting with conscious disregard for the Hills' rights and with the intention of causing (or willfully disregarding the probability of causing) unjust and cruel hardship on the Hills, Auto-Owners consciously ignored the Hills' valid claim and withheld monies and benefits rightfully due them.

66.     On February 21, 2019, the Hills gave notice of their intent to sue Auto-Owners for statutory bad faith if their claim was not honored and an amicable solution to their claim was not reached. *See* Exhibit H.

67. Auto-Owners' bad faith is evidenced by all of the facts and allegations set forth above in this Complaint, including but not limited to, the allegations set forth in Paragraph 51 which are incorporated by reference here, together with the following:

    a. Auto-Owners' refusal to fully investigate the Hills' claim and obtain all available information before refusing to pay the full amount of the Loss;

    b. Auto-Owners' intentional failure to attempt in good faith to effectuate a prompt, fair and equitable settlement of the Hills' claim when liability was reasonably clear and admitted by Auto-Owners;

    c. Auto-Owners' intentional, reckless and/or grossly negligent failure to properly pay the Hills fully for their Loss;

    d. Auto-Owners' intentional failure to pay all amounts due and owing under the Policy with no reasonable or justifiable basis; and

    e. Auto-Owners' unjustified refusal to pay the Hills' claims for its own financial preservation.

68. In so acting, Auto-Owners intended to and did injure the Hills in order to protect its own financial interests and should be punished via the twenty-five percent (25%) bad faith penalty as authorized by statute.

## JURY DEMAND

Plaintiffs hereby demand a trial by a jury of twelve on their claims.

## PRAYER FOR RELIEF

WHEREFORE, as a result of the foregoing, the Hills respectfully request that proper process be issued and served on the Defendant, Auto-Owner (Mutual) Insurance Company, requiring it to answer or otherwise respond in the time period allotted by law, and that this

Honorable Court award a judgment in favor of the Plaintiffs and against the Defendant as follows:

1.  For compensatory damages against Defendant of approximately three hundred sixty-five thousand nine hundred and twenty-four dollars and eighty-six cents ($365,924.86) for Defendant's contractual breaches.

2.  For an award of the 25% statutory bad faith penalty against Auto-Owners pursuant to Tenn. Code Ann. § 56-7-105;

3.  For punitive damages against Auto-Owners to the extent allowed by Tennessee law;

4.  For all costs incurred by the Hills as a result of this action, including but not limited to, the Hills' reasonable and necessary costs, expenses and attorneys' fees;

5.  For an award of pre- and post-judgment interest; and

6.  For such other further and general relief as the Court deems just and equitable.



Respectfully submitted,

**NEAL & HARWELL, PLC**


By:  s/ Mozianio S. Reliford III
      William T. Ramsey, No. 009245
      J. Isaac Sanders, No. 029372
      Mozianio S. Reliford III, No. 036170

1201 Demonbreun St., Suite 1000
Nashville, TN 37203
(615) 244-1713

*Attorneys for Rodney and Katie Hill*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and exact copy of the foregoing *Amended Complaint* has been served on this the 10th day of December, 2019 via CM/ECF upon the following:

Michael A. Johnson, Esq.
Benjamin E. Goldammer, Esq.
Kay Griffin, PLC
222 Second Avenue North
Suite 340-M
Nashville, Tennessee 37201

*Attorneys for Defendant*

s/ Mozianio S. Reliford III _____