UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT WINCHESTER

| | |
|---|---|
| RODNEY HILL and KATIE HILL, ) | |
| ) | |
| *Plaintiffs*, ) | |
| ) | |
| v. ) | Case No. 4:19-cv-78 |
| ) | |
| AUTO-OWNERS (MUTUAL) ) | Judge Steger |
| INSURANCE COMPANY, ) | |
| ) | |
| *Defendant.* ) | |

## MEMORANDUM OPINION AND ORDER

This matter is before the Court upon Defendant Auto-Owners (Mutual) Insurance Company's Motion to Dismiss under Fed. R. Civ. P. 12(b)(6). [Doc. 18].

By way of background, Plaintiffs, Rodney and Katie Hill ("Plaintiffs" or "the Hills"), sued Defendant Auto-Owners (Mutual) Insurance Company ("Defendant" or "Auto-Owners Insurance") over an appraisal of the cost of repairs to their home after it was damaged by a tornado. [*See* Doc. 16]. The Hills and Auto-Owners Insurance disagree over the extent of damage to the home caused by the storm. Auto-Owners Insurance responded with the present motion to dismiss for failure to state a claim and/or enforce appraisal awards. [Doc. 18].

The motion to dismiss was filed under Fed. R. Civ. P. 12(b)(6); however, the motion requires the Court to resolve factual disputes and interpret the insurance policy. Consequently, it is in the nature of a summary judgment motion pursuant to Fed. R. Civ. P. 56, rather than a motion to dismiss. Regardless, the Court finds that the Hills have stated a claim upon which relief can be granted, and the Motion to Dismiss [Doc. 18] will be **DENIED**.

1

## I. Facts[1]

Rodney and Katie Hill had a homeowner's insurance policy with Auto-Owners Insurance. That policy covered accidental, direct physical loss to the Hills' home, other structures, and personal property. The policy limit was $259,500 for the Hills' home, $25,950 for other structures, $225,790 for personal property, and $51,900 for additional living expenses and loss of rent. The policy included a "Guaranteed Home Replacement Cost" endorsement whereby the Hills would receive the current replacement cost of their dwelling in the event of a total loss. The policy also included an endorsement for an additional $50,000 limit of coverage for other structures.

The applicability of the insurance policy provisions became paramount to Rodney and Katie Hill when, just past midnight on November 6, 2018, in Decherd, Tennessee, they awoke to the sound of their home alarm. Through the living room window, Rodney Hill saw that a tornado had uprooted a large tree and flipped it on its side. As the house shook violently, Rodney and his wife, Katie, gathered their two children and ran for the safety of the crawlspace below their garage; however, a large tree smashed through the garage door and a board pierced a vehicle in the garage. As a result, the Hills reentered the house and huddled together in the home's fireplace as the storm raged. It was later confirmed that the Hills and the other residents of Decherd had endured a category EF-2 tornado with winds exceeding 130 mph.

The storm caused significant damage to the Hills' home and personal belongings. They reported their loss to Auto-Owners Insurance on the same day the damage occurred. Auto-Owners Insurance sent an adjuster to the Hills' home the following day. Based on the adjuster's inspection, Auto-Owners Insurance issued an initial payment to the Hills for $35,723.76. Auto-Owners Insurance then hired a structural engineer to inspect the storm damage and prepare a detailed proof

---

[1] At the motion-to-dismiss stage, the Court accepts the plaintiff's allegations as true. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007).

of loss. After the inspection by Auto-Owners Insurance's structural engineer, the insurance company tendered a second payment to the Hills for $65,702.38.

The Hills disputed Auto-Owners Insurance's proof of loss. Because they wanted an independent assessment of the damages, the Hills hired their own structural engineer who prepared a supplemental proof of loss which the Hills submitted to Auto-Owners Insurance.

Auto-Owners Insurance responded to the Hills' independent assessment by requesting that they participate in the policy's appraisal process. The appraisal clause of the Hills' insurance policy reads as follows:

> **APPRAISAL**
>
> If you and we fail to agree on the actual cash value or amount of loss covered by this policy, either party may make written demand for an appraisal. Each party will select a competent and impartial appraiser and notify the other of the appraiser's identity within 20 days after the demand is received. The appraisers will select a competent and impartial umpire. If the appraisers are unable to agree upon an umpire within 15 days, you or we can ask a judge of a court of record in the state where the residence premises is located to select an umpire.
>
> The appraisers shall then appraise the loss, stating separately the actual cash value and loss to each item. If the appraisers submit a written report of an agreement to us, the amount agreed upon shall be the actual cash value or amount of loss. If they cannot agree, they will submit their differences to the umpire. A written award by two will determine the actual cash value or amount of loss.
>
> Each party will pay the appraiser it chooses, and equally pay the umpire and all other expenses of the appraisal.
>
> We retain our right to deny the claim in the event there is an appraisal.

[Doc. 16 at PageID #: 492-93].

Pursuant to the policy, the Hills—through their counsel—confirmed their request for the appraisal and selected Roy Lawson as their appraiser. Auto-Owners Insurance, in turn, selected Mike Gates as its appraiser. These two appraisers, Lawson and Gates, conducted a joint inspection of the Hills' property in June 2019 to assess the damage. Afterward, they prepared separate

3

estimates which differed significantly from one another. Auto-Owners Insurance's appraiser, Mike Gates, assessed the replacement cost value at $99,512.57. The Hills' appraiser, Roy Lawson, estimated the replacement cost value to be $294,029.36.

Because there was such a significant variance between the two appraisals, the Hills and Auto-Owners Insurance proceeded to the next step under the appraisal clause in the insurance policy. The two appraisers, Gates and Lawson, jointly selected an umpire—Larry Masters—to assist in determining the accurate appraisal value. In July 2019, Mr. Masters accompanied Mike Gates and Roy Lawson to the Hills' property. After inspecting the property, Mr. Gates submitted a revised appraisal of $93,762.07, and Mr. Lawson submitted a revised appraisal of $325,024.89. Mr. Masters rejected both Gates' and Lawson's appraisals. Instead, he assessed the replacement cost value at $128,408.89. Auto-Owners Insurance's appraiser, Mike Gates, signed Masters' proposed award, appraising the replacement cash value at $128,408.89 and actual cash value at $119,600.45.

In addition to the coverage of the Hills' property, their policy also provided for additional living expenses equal to "the reasonable increase in your living expenses necessary to maintain your normal standard of living while you live elsewhere." [Doc. 19 at PageID #: 706-07]. Auto-Owners Insurance paid the Hills' increase in living expenses during the appraisal process. Gates and Lawson submitted separate appraisals for these additional living expenses, but again, they were not in agreement. Masters, the umpire, also disagreed with the appraisals of both Gates and Lawson. He set the appraised duration of repairs at five months and recommended an award of additional living expenses during that time. Auto-Owners Insurance's appraiser, Gates, acceded to that recommendation and signed a second award setting the amount of loss for the additional living expenses.

4

In September 2019, Auto-Owners Insurance tendered another check to the Hills in the amount of $48,938.65 as a result of Masters' higher appraisal. Auto-Owners Insurance included a letter with the check, stating that the check represented the extent of their obligations to the Hills.

The Hills then filed suit in November 2019, asserting breach of contract and bad faith under Tenn. Code Ann. § 56-7-105. Notably, in the Hills' homeowner's insurance policy, it states that Auto-Owners Insurance "may not be sued unless there is full compliance with all the terms of this policy. Suit must be brought within one year after the loss or damage occurs." [Doc. 1-1 at PageID #: 50].

## II. Analysis[2]

### A. Comparing a Rule 12(b)(6) Motion to Dismiss with a Rule 56 Motion for Summary Judgment

Auto-Owners Insurance filed its motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted. Nowhere in its motion, however, does Auto-Owners Insurance even mention the words "failure to state a claim." [*See* Doc. 19]. Rather, the motion relies upon evidence outside the four corners of the Amended Complaint, which would seemingly convert it to a motion for summary judgment pursuant to Fed. R. Civ. P. 56.

Fed. R. Civ. P. 12(d) permits courts to convert a Rule 12(b)(6) motion to dismiss into a Rule 56 motion for summary judgment. More specifically, Rule 12(d) states:

> If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.

---

[2] "To determine the applicable substantive law in a diversity-jurisdiction case, federal courts apply the choice-of-law rules of the forum state: here, Tennessee." *JNJ Logistics, LLC v. Scottsdale Ins. Co.*, 617 F. App'x 464, 467-68 (6th Cir. 2015); *see also Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). The Court notes at the outset that Tennessee state courts interpret insurance contracts by giving the policy's terms their natural and ordinary meaning. *Tata v. Nichols*, 848 S.W.2d 649, 650 (Tenn. 1993).

Neither party invoked Rule 12(d) to convert this motion to dismiss into a Rule 56 summary judgment motion; however, it is within the Court's discretion to do so. In a footnote, Auto-Owners Insurance concedes that, if the Court were to consider matters outside the pleadings, then it would have to convert the 12(b)(6) motion into one for summary judgment. [Doc. 19 at PageID #: 704-05, fn. 1]. However, it then makes the argument that "[i]t is widely recognized that documents that are undisputedly authentic or integral to a plaintiff's claim can be considered by the court on a motion to dismiss without converting the motion to one for summary judgment." [*Id.*]. In support of this proposition, Auto-Owners Insurance cites to cases from the Third Circuit, Tenth Circuit, Eighth Circuit, and a non-binding district court case from our sister court in the Eastern District of Michigan. [*Id.*].

Although cases from other circuits are instructive, this Court will look to Sixth Circuit precedent in making its decision. While Sixth Circuit authority does permit conversion of a Rule 12(b)(6) motion into one under Rule 56, it requires district courts to proceed carefully when doing so. The Sixth Circuit has held that a Rule 12(b)(6) conversion into a Rule 56 analysis "should be exercised with great caution and attention to the parties' procedural rights." *Tackett v. M & G Polymers, USA, LLC*, 561 F.3d 478, 487 (6th Cir. 2009) (citing § 1366 Conversion of a Rule 12(b)(6) Motion into a Summary Judgment Motion, 5C Fed. Prac. & Proc. Civ. § 1366 (3d ed.)).

By the plain language of Rule 12(d), parties must be given adequate notice before converting a motion to dismiss into one for summary judgment. *See* Fed.R.Civ.P. 12(d). In *Tackett*, the Sixth Circuit found that, before *sua sponte* converting a Rule 12(b)(6) motion to dismiss into a summary judgment motion, "the district court must afford the party against whom *sua sponte* summary judgment is to be entered ten-day notice and an adequate opportunity to respond." *Id.* (citing *Yashon v. Gregory*, 737 F.2d 547, 552 (6th Cir. 1984)). In a later case, *Briggs v. Ohio*

6

*Elections Commission*, the Sixth Circuit reversed a district court's decision to convert a Rule 12(b)(6) motion when it did not provide the plaintiff with a reasonable opportunity to address conversion to Rule 56 motion. 61 F.3d 487, 493 (6th Cir. 1995).

In view of Sixth Circuit precedent, the Court will not convert Auto-Owner's Rule 12(b)(6) motion to dismiss into a motion for summary judgment because the Plaintiffs have not been given adequate notice. Beyond that, neither party pointed to Rule 12(d) to convert the instant motion into one for summary judgment. For those reasons the Court will analyze the motion under Rule 12(b)(6) as a motion to dismiss for failure to state a claim.

### B. Plaintiffs' complaint states a claim upon which relief can be granted

Under Rule 12(b)(6), defendants bear "the burden of showing that the plaintiff has failed to state a claim for relief." *Crugher v. Prelesnik*, 761 F.3d 610, 614 (6th Cir. 2014) (quoting *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007)). To survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Plausibility "does not impose a probability requirement at the pleading stage." *Id.* at 556. Instead, a claim is plausible where the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). At the pleading stage, the Court must take all of the factual allegations as true and construe the complaint in the plaintiff's favor. *Twombly*, 550 U.S. at 555–56.

Under Fed. R. Civ. P 12(b)(6), a complaint need only contain "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Considering all of the factual allegations as true in a light favorable to the Hills, they have stated a claim for breach of contract by asserting that Auto-Owners Insurance failed to perform its obligations under the Hills'

homeowners' insurance policy because the umpire acted outside the scope of his authority. To assert a breach-of-contract claim, plaintiffs "must prove the existence of a valid and enforceable contract, a deficiency in the performance amounting to a breach, and damages caused by the breach. *Fed. Ins. Co. v. Winters*, 354 S.W.3d 287, 291 (Tenn. 2011) (citing *ARC LifeMed, Inc. v. AMC–Tenn., Inc.*, 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005)).

As to the first element, the Amended Complaint contemplates the existence of a valid and enforceable agreement: "[t]he Policy is a contract between the Hills and Auto-Owners Insurance and is supported by valid consideration." [Doc. 16 at PageID #: 499]. As to the second element, the Hills discussed at length the factual allegations illustrating the Hills' compliance with the terms of the insurance policy,[3] and Auto-Owners Insurance's alleged failure to meet its obligations under the policy.[4] The Hills claimed that the umpire acted outside his authority by making causal and coverage determinations about whether some of the damage was due to the tornado or was pre-existing. The Hills further allege that they suffered damages as a result of Auto-Owners Insurance's alleged non-performance.

In addition to their breach-of-contract claim, the Hills also have a plausible, bad-faith claim against Auto-Owners Insurance. Tennessee's insurance bad-faith statute provides for a penalty, not to exceed 25% of the liability for the loss, when an insurer's refusal to pay the loss was not in good faith. Tenn. Code Ann. § 56–7–105(a). To state a bad-faith claim, plaintiffs must show that: (1) the policy of insurance must, by its terms, have become due and payable; (2) a formal demand for payment must have been made; (3) the insured must have waited 60 days after making a demand before filing suit (unless there was a refusal to pay before the expiration of the 60 days); and (4) the refusal to pay must not have been in good faith. *Montesi v. Nationwide Mut. Ins. Co.*, 970

---

[3] [*Id.* at PageID #: 485, 491-94, 500].
[4] [*Id.* at PageID #: 488–503].

8

F.Supp.2d 784, 791 (W.D. Tenn. 2013). Here, the Hills claim that, despite their requests, Auto-Owners Insurance improperly withheld the funds owed to them under their homeowners' policy. The Hills also provided Auto-Owners Insurance with timely notice of their intent to sue. [*See* Doc. 16, Ex. H].

Although it does not appear, as the case stands now, that Auto-Owners Insurance acted in bad faith, the Court is not being called upon to make that factual determination at this point. To withstand a 12(b)(6) dismissal motion, a complaint must contain "more than labels and conclusions [or] a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. Courts do not mandate "heightened fact pleading of specifics, but only enough facts to state a claim for relief that is plausible on its face." *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. A court examining the sufficiency of a complaint must accept the well-pleaded allegations of the complaint as true. *Id.*; *DiGeronimo Aggregates, LLC v. Zemla*, 763 F.3d 506, 509 (6th Cir. 2014). While a court must accept as true the factual allegations of the complaint, it is not so bound regarding legal conclusions, particularly when couched as the former. *Id.* at 678–79 (citing *Twombly*, 550 U.S. at 555 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986))). Under the liberal Rule 12(b)(6) standard, the Hills have more than "enough facts to state a claim to relief that is plausible on its face" to sustain their bad-faith claim. *See Twombly*, 550 U.S. at 570.

### C. Plaintiffs' claims go beyond the scope of the amount of loss

Even though the Hills meet the pleading standard under Fed. R. Civ. P. 12(b)(6), Auto-Owners Insurance asks the Court to dismiss this case because the Hills participated in Auto-Owners Insurance's binding appraisal process. As a result—argues the insurer—the umpire's

appraisal determination, combined with one appraiser's concurrence, should be binding on the Hills. That is, Auto-Owners Insurance says that while "Tennessee law is clear that appraisers are precluded from resolving coverage issues, it is black letter law that an appraisal is conclusive and binding on the parties as to the loss amount." [Doc. 19 at PageID #: 708].

In support of their position, Auto-Owners Insurance points to *Artist Building Partners v. Auto-Owners Mutual Insurance Company*.[5] In that case, the Tennessee Court of Appeals rejected Auto-Owners' argument that an appraisal panel's determination was non-binding on an insurer. That case involved a building damaged by fire belonging to Artist Building Partners and insured by Auto-Owners. The policy also provided "a form of business interruption insurance." *Artist Bldg. Partners*, 435 S.W.3d at 205. "Insurer did not deny that the damage incurred as a result of the fire was in fact covered by the policy, and it also conceded that Plaintiffs were entitled to some amount of recovery for their lost business income. . . . However, the parties were unable to agree as to the precise sums owed by Insurer." *Id.* So, Artist Building Partners sued. *Id.*

> Shortly after the complaint was filed, an agreed order was entered . . . [that] stated that Insurer had invoked the appraisal provision of the insurance policy, and therefore, the parties agreed that the case would be stayed pending finalization or resolution of the appraisal proceedings. The policy's appraisal provision provided, in pertinent part:
>
> > a. Appraisal
> >
> > If we and you disagree on the amount of Net Income and operating expense or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser.
> >
> > The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the amount of Net Income and operating expense or amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will b[e] binding. . . . The policy further

---

[5] 435 S.W.3d 202, 218 (Tenn. Ct. App. 2013).

10

> provided that Insurer would pay for a covered loss within thirty days after receiving a sworn proof of loss if an appraisal award had been made and the insured had complied with all of the terms of the coverage part.

*Id.* at 206. "Each of the parties selected an appraiser, and the two appraisers selected an umpire. The appraiser selected by Plaintiffs ultimately agreed with the umpire's decisions, and they submitted a binding appraisal award . . . ." to the insurer. *Id.* The insurer complied with the award except for the lost business income. *Id.* at 207. In fact, "with regard to the amount owed for lost business income, [i]nsurer paid only a fraction of the amount referenced in the appraisal award." *Id.* at 207. Artist Building Partners moved for partial summary judgment on the lost-business-income issue, and the trial court agreed; the insurer appealed. *Id.* at 207-214.

"Both the trial court and court of appeals found that the determinations made by the umpire . . . [fell] within the authority granted to the umpire. Because the challenges went to matters that were within the umpire's authority to determine, summary judgment was granted dismissing the challenges because of 'the binding nature of the umpire's decision.'" *Thomas v. Standard Fire Ins. Co.*, No. E201501224COAR3CV, 2016 WL 638559, at *3 (Tenn. Ct. App. February 17, 2016) (referencing *Artist Bldg. Partners*, 435 S.W.3d at 219). That is, the appeals court found that the "insurance policy provided that if the Insurer and the insured disagreed as to 'the amount of loss,' then either party could demand an appraisal of the loss, and a decision by the panel as to the amount of loss would be binding." *Artist Bldg. Partners*, 435 S.W.2d at 218. In summary, because the insurance policy explicitly stated that the appraisal was binding, the trial court found (and the appeals court affirmed) that the appraisal was, in fact, binding upon the parties. *See id.* at 218 ("Pursuant to the insurance policy, the panel was authorized to make a binding determination as to 'the amount of loss,' and the parties expressly agreed to submit to the appraisal panel the issue of 'the actual business income loss incurred.'").

11

Referencing *Artist Building Partners*, Auto-Owners Insurance argues in the present case that the Hills' insurance policy is "clear that a written award signed by any two members of the panel is conclusive as to the loss amount[.]" [Doc. 19 at PageID #: 709]. Thus, according to Auto-Owners Insurance, the Hills should be bound by the umpire's determination and panel's concurrence. [*Id.*]

Auto-Owners Insurance contends that a later, unreported holding in *Thomas v. Standard Fire Insurance Company*[6] further bolsters its position. As in the present case, *Thomas* involved a dispute between a homeowner and an insurance company as a result of tornado damage. *Id.* at *1. In addition, the relevant appraisal clause from *Thomas* is substantially the same as Auto-Owners Insurance's appraisal clause here: "Written agreement signed by any two of these three [appraisers and umpire] shall set the amount of the loss." Compare *id.* at *6 with [Doc. 16 at PageID #: 493]. The *Thomas* homeowner and insurer could not agree on a resolution, so they "each selected an appraiser. After the two appraisers were unable to agree on the amount of loss, the matter was submitted to an umpire. . . ." *Id.* at *2. The umpire determined the amount of loss, and the insurer's appraiser agreed with the umpire's determination. *Id.* The insurer then issued payment in the amount of the umpire's determined loss, but the homeowners would not accept it. They later sued, and the insurer moved for summary judgment.

> The trial court ruled in favor of the insurer, finding the following:
>
> The insurance contract is clear in its terms that the determination of the umpire "shall" bind the parties. Further, the provision is clear with regard to the scope of authority granted to the umpire. It states the appraisal clause is to be used to "set the amount of loss." Thus, based upon a plain reading of the unambiguous language, the one aspect of the umpire's determination that is clearly binding is the determination with regard to the monetary amount of loss.
>
> The second step, then, considers whether [the] [h]omeowners are challenging something within the binding authority of the umpire or outside that granted

---

[6] No. E201501224COAR3CV, 2016 WL 638559, at *6 (Tenn. Ct. App. Feb. 17, 2016).

> authority. . . . The only thing being challenged by [the] [h]omeowners in this case is the amount of loss and nothing else. . . .Unfortunately for [the] [h]omeowners, this is one of the few things they are unable to challenge. They are bound by the terms of their contract and this provision. The umpire was given express and exclusive rights to set the amount of loss and [the] [h]omeowners are bound by, and thereby prohibited from challenging, this.

*Id.* at *4 (quoting the trial court's decision). The homeowners appealed.

The Tennessee Court of Appeals affirmed the lower court. Specifically, the appellate court noted that the "[t]he umpire and one other appraiser agreed [upon] the amount of loss . . . . [the] [h]omeowners d[id] not suggest the appraisal was improperly conducted or there were any coverage issues with the award. They simply desire[d] more money." *Id.* The appeals court held that the parties agreed that the appraisal panel would determine the amount of loss, so the homeowners were not entitled to disregard the policy's "expressed intent and contest the appraisers' finding." *Id.* at *6 (citing *Artist Bldg. Partners v. Auto-Owners Mut. Ins. Co.,* 435 S.W.3d 202 (Tenn. Ct. App. 2014)). Accordingly, the appeals court affirmed "the trial court's finding the parties are bound to the appraisers' determination of the amount of loss. The determinations by the appraisal panel did not exceed the scope of its authority. There is no genuine issue of material fact as to the binding nature of the appraisal panel's finding." *Id.*

The distinction, however, between the present case and both *Artist Building Partners* and *Thomas* is that the Hills dispute more than the amount of loss. They allege that the umpire, Mike Gates, exceeded the scope of his authority under the insurance policy by making causation and coverage decisions. In other words, according to the Hills, the umpire's determination was not simply an appraisal of costs. Rather, the umpire made determinations concerning the scope of damage attributable to the tornado, as well as the scope of damage that preexisted the tornado. He then engaged in an analysis of the insurance policy to determine the scope of damages that were covered by the policy. *See* [Am. Compl. ¶¶ 45-50, Doc. 16 at PageID #: 497-98].

13

The Tennessee Court of Appeals' decision in *Merrimack Mutual Fire Insurance v. Batts*,[7] provides guidance as to the acceptable scope of an umpire's findings. Like the present case, *Merrimack* involved a dispute between a homeowner and an insurer after a tornado damaged the homeowner's house. *Id.* at 145. When the homeowner and insurer could not come to a resolution as to the amount of loss, "both parties invoked the insurance policy's provision for the appointment of appraisers." *Id.* at 145. Notably, the insurer's appraisal clause is identical to the appraisal clause here:

> If you and we fail to agree on the amount of loss, either may demand an appraisal of the loss. In this event, each party will choose a competent appraiser within 20 days after receiving a written request from the other. The two appraisers will choose an umpire. If they cannot agree upon an umpire within 15 days, you or we may request that the choice be made by a judge of a court of record in the state where the "residence premises" is located. The appraisers will separately set the amount of loss. If the appraisers submit a written report of an agreement to us, the amount agreed upon will be the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will set the amount of loss.

*Compare id.* at 145–46 with [Doc. 16 at PageID #: 492-93].

Consistent with the policy, "[a]fter the parties' two appraisers [in *Merrimack*] could not agree on the amount of the loss, the two appraisers selected a third appraiser [i.e., "umpire"] who eventually agreed with the homeowner's appraiser regarding the amount of the loss." *Id.* The homeowner's appraiser agreed with the umpire's finding, setting the amount of loss.

The insurer balked at paying the new, higher amount of loss. Instead, it forwarded the homeowner a check for less than half of the amount as a settlement offer. The insurer explained that it was not paying the full amount of the umpire's finding because the umpire was "limited to determining the amount of the loss and did not extend to deciding coverage questions." *Id.* at 146. The homeowner declined the settlement offer, and the insurer sued.

---

[7] 59 S.W.3d 142 (2001).

Both sides moved for summary judgment: the homeowner argued that the umpire's finding constituted binding arbitration; the insurer argued that it did not. The trial court, siding with the insurer, found that the "appraisal clause was not an agreement for binding arbitration and that the appraisers had not been empowered to determine whether parts of the claimed damages had been caused by a peril covered by the policy." *Id.* at 145. The homeowner appealed.

On appeal, the Tennessee Court of Appeals affirmed the trial court's decision. *Id.* Noting the difference between an arbitration agreement and appraisal, the appeals court found that "[a]rbitration is a consensual proceeding in which the parties select decision-makers of their own choice and then voluntarily submit their disagreement to those decision-makers for resolution in lieu of adjudicating the dispute in court. . . . Appraisal is something narrower. Appraisal is the act of estimating or evaluating something; it usually means the placing of a value on property by some authorized person. . . . Specifically, the object of appraisal in cases of casualty insurance is to quantify the monetary value of a property loss[,] . . . not to decide questions of liability." *Id.* at 149 (citations omitted). The appellate court found it "unnecessary and even inappropriate to abandon the [ ] distinction between the two . . . ." *Id.* The appeals court concluded that, when the insurance company drafted its policy, "it did so relying on the generally prevailing understanding that an appraisal was just that—an appraisal, not binding arbitration." *Id.*[8]

The homeowner also argued that the trial court erred by concluding "that insurance appraisers do not have the authority to determine questions of coverage and liability under an insurance policy." *Id.* at 152. The appeals court found the homeowner's argument unavailing "first

---

[8] Though inapplicable here, the Tennessee Court of Appeals also noted an "second, equally compelling reason for declining to interpret and enforce the appraisal clause . . . as an agreement for binding arbitration[:]" Tennessee's arbitration statute requires that an arbitration agreement involving residential homes have the homeowner sign or initial next to the arbitration clause. *Id.* at 150, 151. It was undisputed in *Merrimack* that the homeowner did not separately sign any appraisal clause, so neither the homeowner nor the insurance company could bind the other to arbitration. *Id.* at 151.

15

because it is not supported by the plain language of . . . [the] insurance policy and second because it flies in the face of settled law on the issue." *Id.* at 152. Noting that "[a]n appraiser's authority is limited to the authority granted in the insurance policy or granted by some other express agreement of the parties," the appellate court held that the insurance policy "confine[d] the role of the appraisers to determining the 'amount of loss.'" *Id.* at 152-53. The appellate court continued:

> In light of other courts' interpretation of similar language, we concluded that the trial court correctly held that [the appraisers] did not have the prerogative to determine whether any particular loss claimed by [the homeowner] was caused by the tornado or whether [the insurer] was ultimately liable under its policy for the loss. The final responsibility for resolving disputes over those issues . . . rests with the courts.

*Id.* at 153.

The Tennessee appellate court's reasoning in *Merrimack* applies to the present case. The Hills' policy with Auto-Owners Insurance provides a mechanism for resolving the "actual cash value or amount of loss covered by" the policy; however, it does not furnish a similar mechanism for resolving coverage disputes. In the absence of an express agreement, resolution of such disputes "rests with the courts." *See id.*

Questions of fact exist in this case concerning the scope of the damage caused by the tornado as opposed to damage that preexisted the tornado. The Hills claim that their appraiser and Auto-Owners Insurance's appraiser "were never in agreement regarding which 'items' were to be valued." [Am. Compl. at ¶ 44, Doc. 16 at PageID #: 495]. Auto-Owners Insurance's appraiser found that some of the damage to the Hills' home was "not caused by the tornado but instead was caused by poor workmanship." [*Id.* at PageID #: 496]. The Hills' appraiser disagreed, "stating that wind uplift, impact loads, pressure, and flying debris cause this type of damage to brick, not mere non-uniform widths of mortar joints." [*Id.*]. According to the Hills, "the appraisers for both sides were operating on entirely different sets of assumptions regarding (1) the scope of the damage

16

caused by the tornado and (2) the scope of coverage under the Policy. As a result, the appraisals . . . reflected not appraisals of the costs of various types of repairs, but also causation and coverage decisions." [*Id.* at ¶ 45].

Since the appraisers could not agree, they submitted their proposals to an umpire: the Hills' appraiser submitted a damage estimate of $325,024.89; Auto-Owners Insurance's appraiser estimated $93,762.07. [*Id.* at ¶ 46]. The umpire—disagreeing with both—then issued a proposed award of $128,408.89. [*Id.* at ¶ 47]. The umpire never submitted a line-item breakdown of how he arrived at the $128,408.89 figure; instead, he listed his findings, via bullet points, in a two-page email to the two appraisers. [Doc. 16-9 at PageID #: 696-97]. The umpire stated that the "floor framing was not damaged by the storm[,]" and "[t]he concaved courses of brick on the front elevation . . . . is of poor quality." [Doc. 16-9 at PageID #: 697].

As required by Rule 12(b)(6), the Court must consider the facts in a light most favorable to the Hills.[9] In doing so, the Court concludes that the umpire necessarily made coverage and causation determinations. *See Merrimack*, 59 S.W.3d at 153 (noting that an umpire "did not have the prerogative to determine whether any particular loss claimed by [the homeowner] was caused by the tornado . . . ."). *See generally* [Doc. 16 at PageID #: 492-93 ("The appraisers will separately set the amount of loss. If the appraisers submit a written report of an agreement to us, the amount agreed upon will be the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two *will set the amount of loss*.") (emphasis added)].

The umpire's coverage and causation analysis distinguishes the present case from *Artist Building Partners* and *Thomas*. *See Thomas*, 2016 WL 638559, at \*6 (affirming an appraisal award

---

[9] *See Twombly*, 550 U.S. at 555–56.

17

as binding because the homeowners did "not suggest the appraisal was improperly conducted or there were any coverage issues with the award. They simply desire[d] more money.").[10]

In this case, the Hills occupy the role of the *Merrimack* insurer in asserting that the umpire's authority was "limited to determining the amount of the loss and did not extend to deciding coverage questions." *Id.* at 146. Paralleling *Merrimack*, Auto-Owners Insurance's policy does not grant umpires "the prerogative to determine whether any particular loss . . . was caused by the tornado or whether [the] [insurer] was ultimately liable under its policy for the loss. The final responsibility for resolving disputes over those issues . . . rests with the courts." *Id.* at 153. Even Auto-Owners concedes as much: "Tennessee law is clear that *appraisers are precluded from resolving coverage issues*, it is black letter law that an appraisal is conclusive and binding on the parties as to the loss amount." [Doc. 19 at PageID #: 708] (emphasis added).

Auto-Owners argues that the "overwhelming majority of courts . . . [hold] that appraisers must make some preliminary causation determinations in any appraisal." [Doc. 25 at PageID #: 757-760]. This may be so. And, practically speaking, it would be difficult to completely divorce causation and coverage findings from an appraised loss. But this Court will follow the reasoning in *Merrimack* which reserves causation and coverage determinations to the courts. *See Merrimack*, 59 S.W.3d at 153; *Pear Tree Properties, LLC v. Acuity*, No. 3:16-CV-00551, 2017 WL 3674845, at *2 (M.D. Tenn. August 25, 2017) (denying a Rule 56 motion, in part, by noting that "the plain language of the policy states that the appraiser makes a determination 'on the value of the property or the amount of the loss.' . . . The appraiser has determined the value of the property and the

---

[10] *See also Artist Bldg. Partners*, 435 S.W.3d 202, 218–19 ("These determinations by the appraisal panel did not exceed the scope of its authority. Pursuant to the insurance policy, the panel was authorized to make a binding determination as to 'the amount of loss,' and the parties expressly agreed to submit to the appraisal panel the issue of the 'the actual business income loss incurred.' Moreover, the parties expressly agreed that the appraisal panel would decide, not only the value of the loss, but 'the reasonable time frame within which the repairs to the building should have been completed.' These determinations necessarily included a determination of the applicable period of restoration.").

18

amount of loss on all disputed areas of liability. Now, the factfinder must determine what areas of loss are covered by the insurance policy.").

### III. Conclusion

For the foregoing reasons, Auto-Owners Insurance's Motion to Dismiss [Doc. 18] is **DENIED.**

**IT SO ORDERED.**

/s/ *Christopher H. Steger*
UNITED STATES MAGISTRATE JUDGE